**Yona OWENS et al., Individually and on behalf of all others similarly situated, Plaintiffs,**

**v.**

**Harold BROWN, Secretary of Defense and W. Graham Claytor, Secretary of the Navy, Defendants.**

**Civ. A. No. 76–2086.**

United States District Court, District of Columbia.

July 27, 1978.

---

Marjorie M. Smith, Jill Laurie Goodman, Susan Deller Ross, New York City, Katherine A. Mazzaferri, Trudy Levy, Washington, D. C., for plaintiffs.

Earl J. Silbert, U. S. Atty., Michael J. Ryan, Lt. Arthur P. Leary, JAGC, USNR, Washington, D. C., for defendants.

## ORDER GRANTING CLASS CERTIFICATION

SIRICA, District Judge.

█ The only serious objection to certifying this case as a [23]b(2) class action on behalf of Navy women stems from the concern voiced by defendants that some female personnel may not share plaintiffs' desire to remove the statutory bar of 10 U.S.C. § 6015 (1970) that prevents their being assigned to duties aboard Navy vessels. Defendants point is not well taken for two principal reasons.

First, defendants have not substantiated their concern that there is actually an antagonism among Navy women concerning duty assignment aboard Navy ships. In an effort to illustrate a difference in opinion in this respect, defendants point only to the results of an unpublished and admittedly inconclusive survey that was taken by defendants' employees of 81 female members of the Navy. While this survey shows that some of the persons interviewed "do not think women should go to sea," the overwhelming consensus is to the contrary.

More importantly, even accepting defendants' assertion of a division of opinion among class members, this difference does not appear to be legally significant on the question of class certification. The issue in this case is not whether the Navy must assign female personnel to ship duty against their wishes. Rather, the question is whether Navy authorities must exclude women from ship assignments whether or not they wish to go to sea. Viewing the issue in this light, it appears that any antagonism that may exist among class members is insignificant since it can readily be obviated by the Navy Department itself when it develops policies concerning the assignment of women aboard Navy vessels. Commanding officers enjoy broad discretion in making duty assignments; and certainly, in assigning women to duty, the Navy can take account of the fact that some females may have joined the service with neither an expectation nor a desire to serve aboard Navy ships. See Defs. Ans. to Pl. Sec. Int. No. 21. In short, it is in defendants' power to obviate any adverse effect that might flow from the difference in attitude that they offer as grounds for denying class certification.

Accordingly, because the Court finds that all requirements of rule 23(a) and 23(b)(2) are satisfied in this instance, it is by the Court this 27th day of July, 1978,

ORDERED that plaintiffs' motion for class certification be, and the same hereby is, granted, and the class is defined to consist of all women serving in the Navy who are or will be adversely affected in their

service careers by the enforcement of 10 U.S.C. § 6015 (1970).

## OPINION

■ This civil rights action presents a challenge to the constitutionality of a federal statute that bars women members of the Navy from performing any duty in any capacity aboard any ship that is currently in service in the Navy's fleet. The provision that occasions this challenge is 10 U.S.C. § 6015 (1970).[1] Section 6015 begins by conferring on the Secretary of the Navy broad discretion to qualify women for naval duty and to prescribe the range of their training and assignments. But the statute concludes with an absolute prohibition that prevents the Secretary from exercising his discretion to assign female personnel to duty at sea. Plaintiffs, a group of female officers and enlisted women in the Navy, challenge this prohibition as abridging the equal protection guarantee embodied in the due process clause of the fifth amendment.[2] Their complaint seeks an order declaring section 6015's absolute bar unlawful and enjoining defendants, the Secretary of the Navy and the Secretary of Defense, from relying on it when formulating policy for the training and assignment of Navy women to duty.[3] As will appear more fully below, plaintiffs' position is well taken. The application of developing equal protection principles convinces the Court that to the extent that section 6015 operates without counter-balancing justification to foreclose the discretion of the Secretary of the Navy regarding the assignment of female personnel to duty aboard Navy vessels, the sweep of the statute is too broad to pass constitutional muster.

## I. Facts and Background

Out of a total personnel complement of approximately half a million individuals, there are some 25,000 women currently serving in the Navy. This number reflects a marked increase in the recruitment of females over recent years and is part of a general trend towards relying more heavily on female personnel to fill the ranks of the several military forces. But none of these many thousands of Navy women is presently permitted to hold any of the wide range of positions available aboard the Navy's fleet. This holds true even when commanding officers find particular women recruits equally as qualified for particular assignments as their male counterparts. This is also the case even when their superiors find them affirmatively more qualified. The reason for this mandated disparate treatment is section 6015, a provision that allows of but one distinction, that of male and female.

The distinction wrought by the statute is the source of numerous and easily documented differences in the prospects facing men and women members of the Navy. But none is more pronounced than exists in the area of duty assignments. The range of duties and assignments available to female members of the Navy is severely re-

---

1. Originally enacted as part of the Women's Armed Services Integration Act of 1948, Pub. L.No. 80–625, 62 Stat. 368 (1948), 10 U.S.C. § 6015 (1970) now provides:

    The Secretary of the Navy may prescribe the manner in which women officers appointed under section 5590 of this title, women warrant officers, and enlisted women members of the Regular Navy and the Regular Marine Corps *shall be trained and qualified* for military duty. The Secretary may prescribe the kind of military duty to which such women members may be assigned and the military authority which they may exercise. *However, women may not* be assigned to duty in aircraft that are engaged in combat missions nor may they *be assigned to duty on*

    *vessels of the Navy other than hospital ships and transports.* (emphasis supplied).
    It is undisputed that there are no hospital ships or transports currently in service in the Navy.

2. *Schlesinger v. Ballard*, 419 U.S. 498, 500 n. 3, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975); *Frontiero v. Richardson*, 411 U.S. 677, 680 n. 5, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); *Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

3. Plaintiffs' amended complaint also seeks an award of damages to compensate plaintiffs for the impairment to their fifth amendment rights caused by section 6015. Plaintiffs, however, have apparently abandoned this claim for relief.

stricted in comparison with assignments open to men for the simple reason that, under the statute, women are eligible exclusively for shore duty, while their male counterparts may serve both on shore billets and in the more numerous positions available at sea. This disparity stands out starkly when a comparison is made between the categories of job classifications that are open to members of the respective sexes. Of the scores of ratings and career classifications available in naval service, females are barred from all but a small fraction, while men, by contrast, are allowed to compete for all available positions. Women are not only excluded from billets that involve assignments at sea, they are also precluded from a significant number of shore billets because these posts are restricted to persons who are *eligible* for duty aboard ships.

The exclusion of women from most job classifications also operates to preclude them from gaining access to a wide range of opportunities for the development of job skills and areas of technical expertise. There is presently little reason for military officials to train and qualify female members to perform jobs that are foreclosed to them by statute. And the Navy has understandably and with almost uniform consistency refrained from training women for callings reserved entirely for members of the opposite sex. Aside from the obvious effect this has on the advancement of females within the Navy, this limitation works the additional consequence of depriving women members of skills that in all likelihood will prove vital to their ability to compete for and secure satisfactory employment when they end their military careers and reenter the private sector.

The disadvantage faced by women in the private sector as a result of section 6015 is heightened by the fact that the statute effectively places a ceiling on the level of female recruitment by the Navy. Despite the current policy to enlarge the female component in the naval forces, the fact remains that only so many shore-confined members are capable of being integrated into a contingent that is "organized, trained and equipped primarily for prompt and sustained combat incident to operations at sea." 10 U.S.C. § 5012(a) (1970). The practical effect of this limitation is that a disproportionately small number of women will have the opportunity to embark upon a career whose successful completion carries with it numerous and economically significant veterans' benefits and preferences.

But a career in the Navy is not measured entirely in terms of the employment opportunities and veterans' privileges that accompany military service. There is in addition to the practical benefits that inure upon serving in the Navy a moral element that forms an integral part of the overall experience. This springs from the idea of individuals taking part in an essential national enterprise to the limits of their abilities. This aspect of a naval career is not something plainly reserved for one gender rather than the other. But because of section 6015, sex is required to take precedence over individual ability where the essential part of naval service is concerned.

Significantly, none of the limitations and disadvantages facing Navy women is traceable to any studied evaluation made of male and female capabilities that reveals that women lack the native ability to perform competently in positions held exclusively by men. Indeed, several reports on the subject made under military auspices suggest that just the opposite is true with respect to some women and some positions. The distinction is rather the product of the statutory presumption reflected in section 6015 that all women are unqualified to discharge any of the duties performed on any of the Navy's ships.

For obvious reasons, the harsh effects occasioned by this presumptive disqualification in individual cases are not difficult to picture. They are amply illustrated by looking at the limitations placed on the military careers of several of the plaintiffs named in this action. Plaintiff Yona Owens, for example, serves in the Navy as an Interior Communications Electrician. Her position involves the repair and maintenance of sophisticated electrical equipment

that is primarily used for navigation and found aboard Navy ships. To develop and utilize her skills more fully, plaintiff Owens has requested that she be assigned to a shipboard position. However, because of section 6015, the Navy has refused to even consider her for duty at sea irrespective of her personal qualifications. The Navy has similarly refused to consider plaintiff Natoka Peden, a photographer and diver, for assignment as a support diver because the diving unit with which she wishes to work is deployed from a ship. This, too, is without regard to plaintiff Peden's individual abilities.

Plaintiff Kathleen Byerly is a naval officer with approximately twelve years of experience. Ranked as a lieutenant commander, and recognized by the Navy as a distinguished officer, she holds the position of Aide and Flag Secretary to the Commander Training Command in the Pacific Fleet. This assignment entails the performance of administrative and liaison functions between the commanding admiral, his staff and his ten subordinate commands. Plaintiff Byerly is the first woman to hold a position of this type. But unlike male officers with comparable backgrounds and experience, she is precluded by section 6015's absolute prohibition from advancing to the prized position of shipboard command. This is so solely because the command of a vessel necessarily involves an assignment at sea and because plaintiff Byerly is a female.

Like plaintiff Byerly, plaintiff Joellen Drag serves as a naval officer. As part of an experimental program, the Navy recruited her to become a member of the first group of women to be trained as Navy pilots. After qualifying as a helicopter pilot, plaintiff Drag was assigned to a support squadron whose primary function involves servicing vessels at sea with supplies. This duty typically requires a temporary assignment to a supply ship and regular flights to and from cruising vessels. Yet because of section 6015, plaintiff Drag is barred from this kind of duty, while equally qualified males are not. As her commanding officer noted to the Secretary of the Navy, plaintiff Drag "is excluded from virtually all operational commitments routinely undertaken by her contemporaries" despite her "demonstrated outstanding performance in all aspects of her assigned duties." [4] In addition, this same limitation on assignments also impairs plaintiff's ability to accumulate the flight time she needs to advance to higher ratings even as a *shore*-based aviation specialist. The reason is that helicopter pilots are required as a condition to advancement to qualify as aircraft commanders with 300 hours of flight time, a goal that is made especially difficult for women because of the scarcity of flight opportunities that are not precluded by the broad sweep of the statute.

The obstacles to career development and national service faced by these women are by no means unprecedented. Traditionally, service in the Navy has been a masculine calling and until World War II the only females allowed to serve as members of the Navy were employed in the traditional areas of nursing and office work.[5] Constraints on female service in the naval forces were somewhat relaxed, however, in 1948 with the enactment of the Women's Armed Services Integration Act.[6] This piece of legislation signified a major step in the direction of expanding the range of career opportunities available to women interested in pursing a career in the Navy and towards equalizing the distribution of privileges and benefits that accompany naval service.[7] But it also contained fundamental limitations.[8] One of the most prominent of these restrictions is the absolute bar against shipboard duty currently reflected in 10 U.S.C. § 6015 (1970).

4. First Endorsement dated March 15, 1976, Pl. Mot. for Sum. Judg., Exhib. A.

5. M. Binkin & S. Bach, *Women and the Military*, at 4–6 (1977).

6. Pub.L.No. 80-625, 62 Stat. 356 (1948).

7. *Id. See also* Binkin & Bach, *supra* note 5, at 10–12.

8. *Id.*

Many of the limitations brought into effect by the Integration Act of 1948 were removed by amendments passed in 1967.[9] These changes were for the most part directed at eliminating general ceilings on the level of female recruitment and specific restrictions on the ability of women to hold permanent positions in some of the Navy's higher grades.[10] The 1967 amendments did not, however, modify the scope of section 6015's blanket prohibition. Far from doing that, they heightened the adverse effect of the constraint by allowing an increasing number of female members to enter the Navy and advance upward through the ranks, while at the same time denying them the career opportunities that comprise the primary mission of the naval forces.

The decision in 1970 to end the draft added a significant impetus for military authorities to reevaluate the utilization of women in the armed services.[11] This reevaluation was necessitated because of the serious and evenly debated question concerning the ability of the military to recruit sufficient numbers of male volunteers without an unacceptable increase in costs and without compromising the quality of new recruits.[12] The effort was also influenced by congressional approval of an Equal Rights provision that did not contain an exception for military affairs.[13] An exception of this kind was offered during the debate on the Equal Rights Amendment, but was defeated by a wide margin.[14] Finally, the reevaluation of the issue of women in the military was occasioned by the enactment of legislation [15] in 1975 that allowed the admission of women to the military academies, the primary source of combat officers, and by the introduction of several bills [16] to prohibit the exclusion of women from combat duty.

As part of this review process, a number of studies were undertaken to look into the relationship between women in the military and military needs and effectiveness.[17] These reports recognize that the projected decline in the number of eligible males makes an increase in the number of women recruits inevitable.[18] In addition, once female enlistments are significantly increased, considerations of personnel management and flexibility require a corresponding expansion in female utilization.[19] This is because, as the Deputy Chief of Naval Personnel recently explained, "If you build into your structure too many people who can't go to sea, then this interferes with the rotation of those who can go either place, and who are experienced." [20]

These reports also recognize that the female population offers a greater reservoir of quality recruits than the male population.[21] Indeed, statistics compiled by the

9. Pub.L.No. 90–130, 81 Stat. 374 (1967).

10. *Id. See also Schlesinger v. Ballard,* 419 U.S. 498, 505 n. 10, 95 S.Ct. 572, 42 L.Ed.2d 610, Binkin & Bach, *supra* note 5, at 12.

11. Binkin & Bach, *supra* note 5, at 13-14.

12. *Id.*

13. 86 Stat. 1523. The text of the Equal Rights Amendment reads:
   Equality of Rights under law shall not be denied or abridged by the United States or by any state on account of sex.

14. 118 Cong.Rec. 9337 (1972); *see also id.* at 9336, 9351.

15. Pub.L.No. 94–106, 89 Stat. 538 (1975).

16. See H.R. 58 (introduced Jan. 1, 1975); H.R. 2190 (introduced Jan. 28, 1975); H.R. 12649 (introduced Mar. 18, 1976).

17. *See, e.g.,* Use of Women in the Military, Office of the Assistant Secretary of Defense (1977), Defs. Ans. to Pl. First Int., Attach. 1; Report of the Task Group of Equal Treatment of Service Women (1973), *id.,* Attach. 20; Navy Affirmative Plan (1976), *id.,* Attach. 18; Report on the Evaluation of the Assignment of Women to the *USS Sanctuary* (1973), *id.,* Attach. 7. *See also* Binkin & Bach, *supra,* note 5.

18. *See* Graph Projection, Defs. Ans. to Pl. Sec. Int. No. 23 & Attach. 6.

19. *Id. See also* Binkin & Bach, *supra* note 5, at 24–26.

20. Statement of Rear Admiral Charles Rauch, Pl. Mot. for Sum. Judg., Exhibit H.

21. Use of Women in the Military, *supra* note 17, at 22-23.

Defense Department reveal that female recruits are on the average brighter than their males counterparts, test higher in areas that are used to predict success in the military and are more apt than males to remain in the military beyond their minimum terms.[22] Moreover, "As male recruiting pressure tightens, these differences in quality between the marginal male and female accession can be expected to widen further."[23]

Cost savings to the military are also a likely consequence of increasing the utilization of women in the armed forces. The marginal cost of recruiting high quality men is approximately $2,000 in comparison with $150 for recruiting women of equal quality.[24] This figure for women compares favorably with the cost of enlisting lower quality men, leading military authorities to conclude: "If women can do enough of the jobs which must be done, considerable savings can be realized."[25] The importance of these savings is particularly apparent given the fact that with the recent decision to employ an all-volunteer military force, increasing expenditures are necessary to maintain an adequate number of recruits.[26] "Indeed, whether this nation can sustain its armed forces solely by voluntary means could well depend on how effectively the female labor resource is employed."[27]

Based on the information brought out in these studies and by an experiment conducted between 1972 and 1974 in which women were allowed to take part in the general management of a Navy vessel,[28] the Department of Defense has forthrightly looked for ways to increase the use of women in the Navy.[29] But the broad sweep and absolute terms of section 6015 have effectively thwarted military authorities in their attempt to expand female utilization. The realization that the statutory bar is as far reaching as the broad terms of the section imply has prompted the Department of Defense to initiate efforts to amend the statute so as to limit the prohibition against women serving on shipboard billets.[30] The Department, through the Secretary of the Navy, has not taken the position that section 6015 should be repealed completely. This is because the likely effects of *total* integration on military effectiveness is presently unclear. But the Department is clear about the positive effects that will flow from moving in measured steps to *enlarge* the areas of female utilization.

The amendments proposed by the Navy to modify section 6015 are limited yet, when the opportunities presently open to female members are considered, they are by no means insignificant. The proposed changes would make it possible to assign qualified women to temporary duty on any vessel not engaged in combat missions and to permanent duty on vessels of a classification similar to hospital ships and transports.[31] This relaxation of the statutory bar would of necessity broaden the training and occupational opportunities open to female recruits and officers by initiating the assignment of both male and female personnel to shipboard duties. In addition, the proposal would enhance career opportunities for Navy women by opening up additional rat-

22. *Id.* at 23.

23. *Id.*

24. *Id.*

25. *Id.*

26. Binkin & Bach, *supra* note 5, at 65–71.

27. *Id.* at 71.

28. Defs. Ans. to Pl. Sec. Int. Nos. 25, 31, 37, 39 & Attachs. 7, 9.

29. Memoranda Regarding Naval Personnel, *id.,* Attach. 19. These materials reflect efforts directed at inquiring into whether some areas of shipboard female utilization might fall outside the scope of section 6015. The conclusions reached are that section 6015 is as encompassing in its prohibition as its absolute terms imply.

30. Letter of W. Graham Claytor, Secretary of the Navy, to the Speaker of the House, dated May 9, 1977, *id.,* Attach. 9.

31. Defs. Ans. to Pl. Sec. Int. Nos. 2, 3 & 4.

ings and classifications that are currently precluded by the statute.[32]

The support shown for the proposal by the Navy and the Department of Defense has created somewhat of an anomaly in the context of the present litigation. In seeking a partial repeal of section 6015, defendants have taken the position that an absolute prohibition against women serving aboard Navy ships is undesirable as a matter of policy and unnecessary as a matter of military preparedness. However, in defending the lawfulness of the provision against plaintiffs' constitutional challenge, defendants have maintained that the classification drawn by section 6015 nevertheless rests on legitimate considerations that justify the disparate treatment accorded Navy men and women. These seemingly conflicting assertions have required defendants to walk somewhat of a narrow line between the two sides of an apparent contradiction. They also explain why defendants have chosen to press the point that the constitutionality of section 6015 raises a nonjusticiable political question. However, for the reasons that follow, the Court is convinced that the distinction drawn by the statute is capable of judicial review and that, to the extent that it represents a generalization about women that even the highest defense authorities concede is unsound, it is not "substantially related to the achievement of . . . [important governmental] objectives." *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976).

## II. *Plaintiffs' Claims are Justiciable.*

Defendants preface their defense on the merits in this case with the claim that because military affairs are implicated, the issue of section 6015's constitutionality raises a nonjusticiable political question. The focus of this argument is on provisions of the Constitution that empower the Congress [33] "To provide and maintain a Navy" and the President [34] to act as the "Commander in Chief of the . . . Navy of the United States." Defendants read these provisions as signifying an intent to commit decisions regarding the military to the discretion of the legislative and executive branches of government and to leave no room for the third branch to exercise independent review. This argument proves too much, however.[35]

To be sure, a high degree of deference is owed to the political branches of government in the area of military affairs. This is so for obvious and compelling reasons. To begin with, there are few "area[s] of government activity in which the courts have less competence" to act than in the highly specialized field of military decision-making. *Gilligan v. Morgan,* 413 U.S. 1, 10, 93 S.Ct. 2440, 2446, 37 L.Ed.2d 407 (1973). Oversight of military operations typically involves "complex, subtle and professional" judgments that are best left to those steeped in the pertinent learning. *Id.* Moreover, defense decisions arise in the

---

**32.** *Id.*

**33.** U.S.Const., Art. I, § 8, cl. 14. This provision reads:

The Congress shall have power—
To provide and maintain a Navy  .  .  . .

**34.** *Id.,* Art. II, § 2, cl. 1. It reads:

The President shall be Commander in Chief of the Army and Navy of the United States
.  .  . .

**35.** The Court does not understand defendants to be making the argument that questions of personnel utilization in the military are *absolutely* committed to the legislative and executive branches of government in the sense that the Constitution explicitly commits to Congress questions concerning the designated qualifications for its membership, see *Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d

491 (1969), and compliance with the republican form of government guarantee, see *Pacific States Tel. & Tel. Co. v. Oregon,* 223 U.S. 118, 32 S.Ct. 224, 56 L.Ed. 377 (1912); *Luther v. Borden,* 48 U.S. (7 How.) 1, 12 L.Ed. 581 (1842), and to the President particular questions concerning foreign policy, see *Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.,* 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948); *Braniff Airways Inc. v. CAB [Chicago-Montreal],* No. 76-2043 (D.C. Cir. July 10, 1978). Instead, it appears that defendants are basing their justiciability argument upon the fact that military questions are within the constitutional powers of the legislative and executive branches and that, *for prudential reasons,* courts should ordinarily regard the exercise of those powers as conclusive.

context of an area of national concern unparalleled in importance to the nation as a whole and thus are of the sort customarily entrusted to the political branches of government. "In framing policies relating to the great issues of national defense, the people are and must be, in a sense, at the mercy of their elected representatives." *Pauling v. McNamara,* 118 U.S.App.D.C. 50, 53, 331 F.2d 796, 799 *cert. denied,* 377 U.S. 933, 84 S.Ct. 1336, 12 L.Ed.2d 297 (1964). Beyond that, there are essential differences between the military and civilian communities that counsel strongly in favor of executive autonomy in military matters subject to legislative guidance. By contrast to the relationship between the government and employees and citizens, the defense establishment relates to military personnel as "employer, landlord, provisioner and lawgiver rolled into one." *Parker v. Levy,* 417 U.S. 733, 751, 94 S.Ct. 2547, 2559, 41 L.Ed.2d 439 (1974). This all-encompassing relationship is one that is largely unfamiliar to the courts and, coupled with the peculiar demands of military discipline and duty, adds impetus to the idea that military judgments deserve an especially high degree of respect.

■ Properly understood, these prudential and separation of powers considerations settle the point that courts should ordinarily exercise a large measure of self-restraint when asked to "interpose the judicial will above that of the Congress and the President." *Pauling, supra,* 118 U.S.App. D.C. at 53, 331 F.2d at 799. But by the same token they do not of necessity compel the courts to abdicate their responsibility to decide cases and controversies merely because they arise in the military context. Contrary to defendants' assertion, the deserved margin of latitude afforded the political branches of government in rendering military judgments seems *as a general matter* to figure more prominently into wheth-er particular decisions are lawful than into whether they are susceptible to review at all. Whether the deference due particular military determinations rises to the level of occasioning nonreviewability is a question that varies from case to case and turns on the degree to which the specific determinations are laden with discretion and the likelihood that judicial resolution will involve the courts in an inappropriate degree of supervision over primary military activities. *See Gilligan v. Morgan,* 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973); *Mindes v. Seaman,* 453 F.2d 197, 201–202 (5th Cir. 1971). Adoption of defendants' blanket assertion would blur these important distinctions.

■ This conclusion finds firm support in the case law. The leading precedent is *Schlesinger v. Ballard,* 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975). In that case, a Navy lieutenant brought suit to challenge a federal statutory scheme that favored the promotion of women officers over men. Plaintiff claimed that this difference in personnel policy offended the equal protection guarantee of the fifth amendment. Ultimately, plaintiff's challenge was rejected by the Supreme Court. But significantly the Court did not reach this result by refraining from a decision on the merits based on notions of nonreviewability. Quite to the contrary, the Court resolved the dispute by applying substantive equal protection principles and by concluding that the disparate treatment occasioned by the statutory arrangement was rational because, as a result of 10 U.S.C. § 6015 (1970), "female lieutenants will not generally have compiled records of seagoing services comparable to those of male lieutenants." *Id.* at 509, 95 S.Ct. at 577.[36]

Nor did considerations of deference for the other branches of government prevent substantive review of military personnel policies in *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973).

**36.** It should be pointed out that the Court in *Schlesinger* expressed great deference for legislative and executive oversight in the field of military affairs. 419 U.S. at 510, 95 S.Ct. 572, 578. But the Court concluded by reinforcing the idea that military judgments by the political branches are nevertheless reviewable by the courts for constitutional infirmities: "We cannot say that, in exercising its broad constitutional power here, Congress has violated the Due Process Clause of the Fifth Amendment." *Id.*

There, a statutory difference between male and female members of the uniformed services that involved entitlements to housing, medical, and dental benefits was stricken on equal protection grounds. A review of the Court's decision shows not the slightest hesitancy about reaching the merits even though military affairs were involved.

In a like vein, deference for legislative and executive oversight of the military did not preclude independent review in *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). At issue in *Parker* was the constitutionality of Army regulations that permitted the courtmartial of a military physician for making disrespectful and disloyal statements to other military personnel. Even though the case presented a question touching upon the discretionary area of military discipline, the Court went forward to reach the merits. In so doing, it implicitly recognized that while the obvious differences between the military and civilian communities provide the backdrop against which to test the lawfulness of military decisions, they do not of necessity furnish a basis for foregoing review.

Nor are *Schlesinger, Frontiero* and *Parker* the only authorities to uphold the ability of the courts to inquire into internal military affairs. Indeed, as the Court of Appeals for the Second Circuit has noted, "a succession of cases in this circuit and elsewhere has reiterated the proposition that the military is subject to the Bill of Rights and its constitutional implications." *Crawford v. Cushman*, 531 F.2d 1114, 1120 (2d Cir. 1976). In the First Circuit, for example, the reach of the courts was held to extend to discharge petitions where constitutional rights are at stake. *See, e. g., Ashe v. McNamara*, 355 F.2d 277 (1st Cir. 1965). The decisions of the Second and Fourth Circuits are to the same general effect. *See, e. g., Hammond v. Lenfest*, 398 F.2d 705 (2d Cir. 1968); *Reed v. Franke*, 297 F.2d 17 (4th Cir. 1961). Other cases from

the Second and Fifth Circuits have allowed review of military actions to determine whether they were undertaken in compliance with constitutional guarantees, *see, e. g., Crawford, supra*, within the scope of official authority, *see, e. g., Mindes v. Seaman*, 453 F.2d 197 (5th Cir. 1971), and in conformity with applicable military regulations, *see, e. g., Smith v. Resor*, 406 F.2d 141 (2d Cir. 1969). In the District of Columbia Circuit, the reach of judicial review was recently upheld in *Waldie v. Schlesinger*, 166 U.S.App.D.C. 175, 509 F.2d 508 (1974), to allow an equal protection challenge to a "men only" policy not unlike the one being challenged in the case at bar. There, plaintiffs asserted the unlawfulness of a policy that barred women from being admitted to the United States Air Force and Naval Academies even for training "in specialties *which are open to women.*" *Id.* 166 U.S. App.D.C. at 177, 509 F.2d at 510 (emphasis original).[37] Overturning a decision granting the government's motion for summary judgment, the Court quite forcefully indicated that a decision on the substance of plaintiffs' claims was appropriate and "remanded for a full trial on the merits." *Id.* 166 U.S.App.D.C. at 178, 509 F.2d at 511.

Defendants seemingly recognize that the weight of authority is to allow independent review in the field of military affairs. Nevertheless, they argue that in the context of this particular case special factors call for the exercise of judicial restraint. The first and foremost of these special considerations stems from the view that a decision in plaintiffs' favor on the merits of this case is apt to involve the court in the supervision of military activities without the benefit of readily discoverable standards. Defendants suggest that if plaintiffs' challenge is actually reviewed and found to have merit, the inevitable result will be for the *court* to embark upon the unchartered course of supervising the "full sexual inte-

---

**37.** It requires noting that, remanding for a trial on the merits, the Court in *Waldie* was directing the trial judge to review a "men only" policy of less import to the military than the policy reflected in section 6015. However, nothing in the court's opinion indicates that if the question presented had been the constitutionality of section 6015, judicial review would have been improper.

gration of our armed services." [38] Defendants conclude that a decision of this magnitude is better left to the political branches in light of "their more extensive resources" and expertise.[39]

Were this a case like *Gilligan v. Morgan,* 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973), defendants' contention would have force. *Gilligan* involved a suit brought by a group of students at Kent State University to obtain review of the activities of the Ohio National Guard. Plaintiffs sought neither an award of damages nor an injunction to prevent specific unlawful actions. Rather, they sought a comprehensive array of injunctive remedies amounting to "continuing judicial surveillance over the Guard" and the judicial promulgation of "standards for the training, kinds of weapons and scope and kinds of orders to control the actions of the National Guard." *Id.* at 6, 93 S.Ct. at 2443. Understandably, the Court relied on nonjusticiability principles to overturn a decision by the Sixth Circuit that would have assigned to a judge the task of "evolving methods of training, equipping, and controlling military forces." *Id.* at 8, 93 S.Ct. at 2445.

*Gilligan* is is not this case, however. Contrary to defendants' contention, a decision favorable to the plaintiffs in this case will most assuredly *not* have the effect of requiring "continuing judicial surveillance" over discretionary military activities. *Id.* at 6, 93 S.Ct. 2440. Far from doing that, a decision in plaintiffs' favor will simply lift the bar contained in section 6015 that currently prevents defense authorities from exercising *their* discretion regarding female utilization in the manner *they* see fit.[40]

Unlike in *Gilligan,* a decision here will properly leave to experts the task of making "[t]he complex, subtle and professional decisions as to the composition, training, equipping, and control of a military force." *Id.* at 10, 93 S.Ct. at 2446.[41]

■ Defendants also urge the Court to forego review in this case on the grounds that a decision on the merits will likely affect ongoing congressional consideration of the Navy's proposal to amend section 6015. That, of course, may be true. Yet defendants have offered no authority for the view that judicial review of a statutory policy is in any way to be gauged to the progress of legislative efforts to arrive at a new policy. Moreover, even if it is assumed that a decision here will influence consideration of the Navy's proposal, it is highly unlikely that the effect will be adverse to the political process. Indeed, resolution of plaintiffs' equal protection claims will in all likelihood serve to focus the relevant issues and advance the proposed amendments on the legislative agenda.[42]

In sum, then, neither deference for the decisions of the political branches of government in the area of military affairs, nor concern about undue judicial intervention, nor the likelihood of influencing legislative efforts to revise section 6015 affords a principled basis for avoiding a decision on the precise claims raised by plaintiffs in this case. Notwithstanding defendants' argument to the contrary, these considerations go more to whether section 6015's prohibition is lawful and to the question of appropriate remedy, than to whether the dispute is justiciable. Consequently, if section 6015

---

38. Defs. Mot. for Sum. Judg., at 6.

39. *Id.*

40. As noted earlier, defendants have proposed an amendment to section 6015 that would allow the assignment of women members of the Navy to noncombat shipboard duties.

41. A decision in the instant case will not do violence to the idea, aptly expressed by Justice Jackson in relation to another branch of the armed services: "judges are not given the task of running the Army." *Orloff v. Willoughby,*

345 U.S. 83, 93, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953).

42. If anything, defendants' contention on this point is relevant to the question of whether the Court should grant a stay in this case to permit the legislative process to run its course. Defendants, however, have not asked the Court to stay its hand temporarily pending a legislative solution to plaintiffs' claims. Rather, they have asked the Court to refrain from review altogether. *See* Trans. of Oral Arg., filed April 11, 1978, at 12 13.

is to be upheld, it must be because the statute advances some important government policy.

## III. *Equal Protection*

### (1)

The Supreme Court first struck down a statute drawing a classification between the sexes in 1971.[43] That result was reached in *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), a case in which a woman challenged a state law that gave men a mandatory preference over women for appointment as the administrators of estates. In the ensuing seven years since *Reed,* the Court has had several occasions to review provisions that in one way or another have drawn distinctions between members of the opposite sex.[44] The result is an uneven and somewhat unsteady trend in the development of a single body of principles to apply in cases raising claims of sex discrimination.

This uncertainty arises less from the problem of identifying the relevant factors to consider in reviewing sex discrimination than from the problem of articulating a single standard that is, on the one hand, strict enough to strike down arbitrary and unreasonable classifications and that is, on the other, flexible enough to uphold distinctions that bear a fair relation to legitimate government purposes. Initially, the cases focus on whether the classification under review stems from an outmoded way of thinking about members of the opposite sex. To the extent that differences in treatment can be traced to overbroad generalizations about the roles played by men and women in society, the approach is to view them with suspicion.[45] This approach explains the results reached in the *Stanton v. Stanton,* 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975), *Weinberger v. Wiesenfeld,* 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975) and *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), decisions. *Stanton* involved a statute that fostered the idea that females reach the age of emancipation sooner than their male counterparts. The *Wiesenfeld* decision struck down a provision that presumed working women always to be dependent on their spouses for support. And *Frontiero* invalidated a federal law that reflected a similar notion about women in the military.

Another essential factor identified in the cases is the importance of the governmental objective that is sought to be achieved by means of treating the sexes differently. Administrative convenience in providing

---

**43.** Prior to 1971, the Supreme Court had sustained a number of gender-related classifications, expressing a generally deferential regard for such distinctions. In *Hoyt v. Florida,* 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961), the Court upheld a state jury selection system that hinged the jury duty of women upon whether they had registered for jury service. Likewise, in *Goesaert v. Cleary,* 335 U.S. 464, 64 S.Ct. 198, 93 L.Ed. 163 (1948), the Court validated a law that prohibited women from working as bartenders. And in *Muller v. Oregon,* 208 U.S. 412, 28 S.Ct. 324, 52 L.Ed. 551 (1908), the Court sustained a state statute that placed a limit on the number of hours female employees could work.

**44.** *Califano v. Goldfarb,* 430 U.S. 199, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977); *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *Stanton v. Stanton,* 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975); *Weinberger v. Wiesenfeld,* 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975); *Schlesinger v. Ballard,* 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975);

*Kahn v. Shevin,* 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974); *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973).

**45.** *See, e. g., Califano v. Goldfarb,* 430 U.S. 199, 217, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977) (presumption about the dependency of surviving spouses); *Craig v. Boren,* 429 U.S. 190, 198–99, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (women presumed to mature faster than men); *Stanton v. Stanton,* 421 U.S. 7, 14–15, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975) (18–20-year-old females presumed less likely than males to need financial support); *Weinberger v. Wiesenfeld,* 420 U.S. 636, 644, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975) (presumption that the husband is the spouse responsible for support of the family); *Frontiero v. Richardson,* 411 U.S. 677, 683–85, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (female spouses of servicemen presumed to be dependent upon their husbands); *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) (presumption that men are better qualified than women to serve as the administrators of estates).

men and women government benefits according to different criteria and procedures has generally been regarded as a low priority, *Califano v. Goldfarb,* 430 U.S. 199, 217, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977), *Frontiero, supra,* 411 U.S. at 688–89, 93 S.Ct. 1764, while public safety, *Craig v. Boren,* 429 U.S. 190, 199, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), efficiency in judicial administration, *Reed, supra,* 404 U.S. at 75, 92 S.Ct. 251, and efforts to alleviate burdens that fall more heavily on one sex than the other, *Schlesinger v. Ballard,* 419 U.S. 498, 508–509, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975), *Kahn v. Shevin,* 416 U.S. 351, 352–55, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974), are acceptable.

■ Just as critical a factor is the degree to which the classification serves to advance the objective that the government has put forward as the basis for the difference in treatment. Obviously, if the classification under review bears no relation to the statutory purpose, the distinction is suspect. That was the situation in *Wiesenfeld.* At issue there was a statute that purported to provide financial benefits to surviving parents to make it easier for them to stay at home and care for their dependent children. However, because the statute aided only surviving mothers and not fathers, the classification was found to be "entirely irrational" because the objective of facilitating better care for dependent children did not depend on the gender of the surviving parent. 420 U.S. at 651, 95 S.Ct. 1225. Surviving fathers as well as mothers needed financial assistance to remain home to care for their children. *Id.* Moreover, even where a classification is viewed as actually furthering a proper statutory purpose, the distinction must bear a strong relation to the government's objective. This requirement accounts for the result in *Craig.* In that case, a drinking age differential for 18–20-year-olds was invalidated because the evidence failed to show a "substantial" correlation between the classification and the goal of highway safety. 429 U.S. at 204, 97 S.Ct. 451. This principle also explains why the different treatment given male and female officers and widowers and widows was upheld in the *Ballard* and *Kahn* decisions. In those cases, preferential treatment for women was found to be legitimate because female officers were persuasively shown to be at a disadvantage as compared to men in seeking promotions and because the death of a spouse was proved to create a greater financial burden on widows than on widowers. 419 U.S. at 508, 95 S.Ct. 572; 416 U.S. at 355, 94 S.Ct. 1734.

■ While the cases since *Reed* make clear the factors that are to be applied in sex discrimination cases, questions persist concerning the precise way they are to be fashioned together to form a single framework for review.[46] The most important of these uncertainties relates to the requirement that classifications between the sexes must advance legitimate legislative objectives. The question concerns the degree of correlation that must be shown between the differences in treatment accorded to men and women and the objectives sought to be achieved. This issue is of signal importance because the required degree of correlation is the principal factor that fixes the strictness with which gender

---

**46.** These unresolved questions include: are all traditional ways of thinking about the roles of men and women to be viewed as suspicious in like degree; is the appropriate degree of suspicion related to nature of the loss that is occasioned by the difference in treatment between the sexes or to the importance of the disadvantage? How much special deference is due classifications by gender in the areas of tax legislation (*Kahn, e. g.*), military affairs (*Ballard, e. g.*) or social welfare (*Goldfarb, e.g.*); in what other areas are legislative classifications by sex entitled to a deferential regard; how should this deference be manifested; by requiring less of a correlation between the government's objective and the classification under review, by qualifying lesser state objectives as sufficiently important to justify sex-based discrimination? Are courts confined to looking at the actual statutory purposes of sex-based legislation or are they permitted to accept post fact rationalizations; what statutory objectives qualify as of sufficient importance to outweigh different treatment accorded to men and women; is the necessary degree of importance related to the gravity of the harm or loss occasioned by the gender-based classification?

classifications are to be scrutinized. As the necessary measure of correlation moves higher, the level of scrutiny intensifies to the same extent, and as a weaker "congruence" becomes sufficient, the level of review is correspondingly relaxed. *Craig, supra,* 429 U.S. at 199, 97 S.Ct. 451.

■ But a single standard seems to have emerged. As recently formulated in the *Craig* decision and quoted with approval in *Goldfarb*, the degree to which a "sex-centered generalization actually comport[s] with fact," *Craig, supra,* 429 U.S. at 199, 97 S.Ct. at 458, must be substantial: "[t]o withstand constitutional challenge, . . . classifications by gender must be *substantially related to the achievement of [important] objectives." Goldfarb, supra,* 430 U.S. at 210–11, 97 S.Ct. at 457, *quoting, Craig, supra,* 429 U.S. at 197, 97 S.Ct. 451 (emphasis supplied).[47] Judged by this standard, the classification drawn by section 6015 fails to withstand scrutiny.

### (2)

In an effort to demonstrate the validity of section 6015's prohibition, defendants maintain that the basic purpose of the enactment was to increase the combat effectiveness of Navy ships.[48] Unquestionably, this is a governmental objective of the highest order and a purpose entitled to great respect. But nowhere in the papers filed in this action have defendants pointed to any evidence indicating that military preparedness was indeed the objective behind the prohibition. The apparent reason is that the part of section 6015 being challenged in this lawsuit was added casually, over the military's objections and without significant deliberation.[49]

Section 6015 was enacted some 30 years ago as part of a larger piece of legislation, requested by the military, that first admitted women to regular, peace-time military duty.[50] A review of the legislative history behind the provision reveals that section 6015 was originally introduced without the proviso that prohibits women from serving aboard Navy vessels other than hospital ships and transports. The prohibition was added during committee hearings on the legislation following an exchange between a committeeman and Navy officials.[51] In response to an inquiry, the Navy stated that while it had no present intention to assign women to general shipboard duties, it "did not feel . . . that it was necessary to write that into law."[52] However, the committeeman insisted that the question not be left to the Secretary of the Navy's discre-

---

47. As noted in *Goldfarb*, the substantiality of the correlation between purpose and classification may be measured in terms of the degree to which gender-based classifications are "over-inclusive" or "under-inclusive." 430 U.S. at 211 n. 9, 97 S.Ct. 1021. If, for example, a gender classification presumes all women to have a certain trait when in fact only a fraction do, the classification is "over-inclusive." Conversely, if legislation presumes women to have a certain characteristic when many men have the same trait, the provision may be viewed as "under-inclusive." In the instant case, the problem with section 6015 is "over-inclusiveness" since the statute presumes all women to be unqualified for all positions on all ships currently in use by the Navy.

48. *See* Defs. Mot. for Sum. Judg., at 16 ("maximum combat effectiveness of Navy ships" and "a strong Navy").

49. Defendants seem to admit as much in their answers to plaintiffs' interrogatories. When asked to articulate section 6015's legislative purpose, defendants responded:

> Congress has *apparently* determined that 10 U.S.C. § 6015 bears a rational relationship to and substantially furthers legitimate and important governmental objectives. As this litigation proceeds, defendants *will endeavor* to demonstrate their perception of that congressional determination.

Defs. Ans. to Pl. Sec. Int. No. 66 (emphasis supplied).

To date, defendants have yet to supplement this response regarding section 6015's legislative purpose.

50. Women's Armed Services Integration Act of 1948, Pub.L.No. 80–625, 62 Stat. 368 (1948).

51. *Hearings before the Subcommittee on Organization and Mobilization of the House Committee on Armed Services,* 80th Cong., 2d Sess. 5689–5713 (1948).

52. *Id.* at 5689.

tion,[53] and so appropriate language was added during the session.[54]

The discussion with the Navy officials sheds little light on the rationale for excluding women members from serving aboard naval ships. But this much appears to be certain. The provision was not directed at enhancing military preparedness because the sweep of the prohibition was purposely extended to cover both combat assignments and noncombat assignments. Nor was it inserted to take account of the practical considerations associated with integrating shipboard personnel, such as increased costs, the need to equip ships to provide quarters for female personnel, adjustments in functions, or the necessity of preparing all male crews to accommodate their female counterparts. The transcript of the hearing is conspicuously lacking in deliberation on any of these points. Instead, the sense of the discussion is that section 6015's bar against assigning females to shipboard duty was premised on the motion that duty at sea is part of an essentially masculine tradition.

■ Defendants seemingly recognize that this legislative background tends to suggest a statutory purpose more related to the traditional way of thinking about women than to the demands of military preparedness. Nevertheless, they point out that regardless of intent the statutory bar con-

tained in section 6015 serves a number of legitimate governmental objectives.[55] The first and foremost of these is the objective of maintaining the most effective naval combat force possible. Defendants reason that inasmuch as broad prohibitions like section 6015 have impeded military authorities in their efforts to gather information about the capabilities of women and the effects of enlarging female utilization, "there [remain] a number of legitimate concerns with regard to full sexual integration of the combat arms of the United States Armed Forces."[56] These concerns focus on the unknown effects that full sexual integration might have on group dynamics under *combat* conditions, on the ability of the Navy to operate as effectively as it might with all male *combatants*, on the capacity of the American people to accept the prospect of female *combat* casualties, and on the attitude of enemies to engage the United States in *combat* because of a perceived weakness in our *combat* arms. Defendants conclude that "The fact that these are legitimate concerns to which there are presently no considered and studied answers provides a persuasive rationale for the present restrictions on full integration."[57]

This argument is unpersuasive. Defendants' line of reasoning would have force if the issue in this case were the validity of a statute that precluded women from being

53. *Id.* at 5690, 5711, (remarks of Cong. Vinson). The Congressman stated:

I am just throwing it out for what it is worth. Those are my views. I think it will strengthen the bill to have it positively understood by Congress that ships are not places to which these women are going to be detailed and nobody has any authority to detail them to serve on ships.

Of course, they are not going to be detailed to serve on ships, but you cannot tell what happens . . . somebody might say they need a few of them up there to do communications or other kinds of work and I do not think a ship is a proper place for them to serve. Let them serve on shore in the continental United States and outside of the United States, but keep them off the ships. Of course, they ought to be on hospital ships.
　　*　　*　　*　　*　　*　　*
I would not want to restrict [the prohibition] to combatant vessels. Put down 'serve in sea duty.' You have auxiliary ships as

well as combat ships. Just fix it so that they cannot go to sea at all.

54. *Id.* at 5711.

55. While the "Court need not in equal protection cases accept at face value assertions of legislative purposes, when an examination of the legislative scheme and its history demonstrates that the asserted purpose could not have been a goal of the legislation," *Wiesenfeld, supra*, 420 U.S. at 648 n. 16, 95 S.Ct. at 1233, there is no requirement that the Court must overlook unexpressed legislative objectives that reasonably *could have* formed the basis of the statute in question. Thus, defendants' rationalization of what purposes are served by section 6015 is entitled to consideration.

56. Defs. Mot. for Sum. Judg., at 14.

57. *Id.* at 15.

considered solely for shipboard *combat* assignments. The same is true if the effect of deciding this case in plaintiffs' favor were to require the *full integration* of men and women in the naval forces. This is so because the seriousness of the unanswered questions raised by defendants is alone a convincing reason why no authority, whether legislative, executive or judicial, should act to bring about the total integration of Navy women into combat roles before the consequences have been fully explored.

But the issue presented in this case is not whether the naval forces should be completely integrated and the roles of male and female members made perfectly equal. Nor is the question whether Navy women should have the same rights as men to receive assignments as combatants aboard Navy ships. The issue is rather the validity of a prohibition that not only forecloses the Navy's discretion to integrate women into combat positions for which their qualifications and the effects of their presence are unknown, but also bars Navy authorities from exercising their discretion to assign female personnel to noncombat duties for which they are or can be qualified. Contrary to defendants' assertion, then, the question presented is the reasonableness of a statutory bar that draws no distinctions based on considerations of military effectiveness among any of various assignments available to Navy personnel on ships.

Once the questions about full sexual integration and combat assignments are put aside, the overbreadth of section 6015 be-

comes apparent. Significantly, defendants do not make the argument that the demands of military preparedness and effectiveness justify excluding *all* women from *all* shipboard duties. Nor could they given the fact that they have proposed changes in section 6015 [58] that would permit qualified women to serve on ships in a wide variety of noncombat positions.[59] As the Secretary of the Navy has observed, "the revised law would permit temporary duty assignments of women on any naval vessel not engaged or expected to be engaged in combat." And as the Secretary has also noted, if the absolute bar contained in section 6015 were lifted, "women pilots could land aircraft on a carrier, women inspectors and technicians could go aboard a destroyer or cruiser, and our female midshipmen could get real training at sea." [60]

Unlike with the original version of section 6015, the proposed amendments are based on evidence compiled as a result of studies and experiments conducted by military authorities.[61] This information shows not only that women can "capably perform" at sea, but also that increasing the range of their assignments will enhance "the operational effectiveness and flexibility of available forces." [62] Moreover, "more efficient utilization of women" will help to solve the "particularly worrisome" problem posed by "[t]he shrinking manpower pool that we see in front of use in the next decade." [63] And finally, permitting women to serve aboard ships "would not increase the budgetary

---

**58.** Letter of W. Graham Claytor, Secretary of the Navy, to the Speaker of the House, dated May 9, 1977, Defs. Ans. to Pl. First Int., Attach. 9. The proposed amendments to section 6015 would replace the current prohibition with this language:

> However, women may not be assigned to duty in vessels or aircraft that are engaged in combat missions nor may they be assigned to other than temporary duty on vessels of the Navy except for hospital ships, transports, and vessels of a similar classification not expected to be assigned combat missions.

**59.** *See* SEC–NAV Instruction 5030.1G, Defs. Ans. to Pl. First Int., Attach. 16 (listing combat ship, combat craft, auxiliary ship and service craft classifications).

**60.** Address of W. Graham Claytor, Secretary of the Navy, delivered July 21, 1977, *id.*, Attach. 13, at 5.

**61.** *See* note 17 *supra*. *See also* Statement of Edward Hidalgo, Assistant Secretary of the Navy, on Employment and Utilization of Women in the Navy, delivered July 1977 to The Priorities and Economy Subcommittee of the Joint Economic Committee, Defs. Ans. to Pl. First Int., Attach. 12.

**62.** Letter of W. Graham Claytor, *supra* note 58, at 1.

**63.** Address of W. Graham Claytor, *supra* note 60, at 5.

requirements of the Department of Defense."[64]

These considerations are particularly well suited for study by Congress in regards to defining the limits of female utilization in the Navy. But they are also highly relevant to the question of whether section 6015 is "so unjustifiable as to be violative of due process." *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954). The core protection afforded by the equal protection component of the fifth amendment is that laws favoring members of one gender and disadvantaging members of the other be reasonably and, beyond that, substantially related to the achievement of some important objective. *Goldfarb, supra; Craig, supra.* To the extent that legislative classifications are based on "overbroad generalizations" about the traits, behavior and capabilities of the different sexes, *Ballard, supra,* 419 U.S. at 507, 95 S.Ct. 572, their reasonableness is rightly called into question. Because section 6015 operates to bar an entire sex from a wide, though by no means unlimited, range of career and service opportunities for which the highest military authorities have determined them to be qualified, the sweep of the statute is too broad to pass muster.[65]

Obviously, legislative distinctions between members of the opposite sexes need not be drawn with *perfect* precision to withstand challenge. This is so even though "heightened levels of scrutiny" apply in the area of sex discrimination. *Goldfarb, supra,* 430 U.S. at 225, 97 S.Ct. 1021 (dissenting opinion). But validity *does* depend on an unusually high degree of correlation between sexual traits underlying differences in treatment and important legislative objectives. As the Supreme Court found in *Goldfarb* with respect to financial aid, a correlation of approximately 90% between the characteristic and the objective was insufficient to withstand attack, *id.* at 238 n. 7, 97 S.Ct. 1021 (dissenting opinion), even though Congress is "wide latitude to create classifications that allocate noncontractual benefits under a social welfare program." *Id.* at 210, 97 S.Ct. 1021 at 1028.

Congress, of course, enjoys the same degree of latitude in legislating in the area of military affairs. *Ballard, supra,* 419 U.S. at 510, 95 S.Ct. 572. However, the record in the case at bar does not suggest that the correlation between female capabilities and overall naval effectiveness even approaches that deemed to be inadequate in *Goldfarb.*

(3)

In addition to military efficiency, defendants argue that section 6015's absolute bar should be upheld because *any* degree of integration of men and women aboard Navy ships is apt to cause morale

---

**64.** Letter of W. Graham Claytor, *supra* note 58, at 2.

**65.** In reaching this conclusion, the Court has focused on those noncombat positions for which the evidence shows women are fully qualified. As to those assignments, the statutory bar is irrational because both men and women can perform capably. However, looking at the entire range of noncombat *and* combat assignments available to Navy personnel, the statute takes on a less irrational appearance because most positions in the Navy are combat positions and the available data is unclear about the effect of integrating women into combat roles.

This feature of the instant case, that more than one type of opportunity or entitlement is distributed along sexual lines, distinguishes this case from the facts of the sex discrimination cases decided since *Reed.* In those decisions, the issue was whether a government objective was reasonably or substantially furthered by providing a *single* benefit or preference to one sex rather than another. Thus the issue never arose of whether a legislative classification should be struck down because it was highly irrational as to one benefit and less irrational as to another.

In the present case, the Court has chosen to measure section 6015's rationality both from the standpoint of women's proven ability to perform capably in noncombat shipboard positions and from the perspective of their yet unproven ability to be satisfactorily integrated into the entire range of Navy duties, noncombat and combat alike. The result is that the statutory presumption is wholly irrational as to noncombat assignments and largely rational but not rational enough as to the full range of naval duties.

and discipline problems among crews. Wholly aside from the fact that any uncertainties in this regard are largely traceable to the statute's obvious limitation on experimenting with mixed crews, this argument is also belied by the facts. Indeed, the results of the experiment conducted by the Navy on the USS Sanctuary provide ample refuting evidence that assigning women to noncombat duty on vessels will pose no insurmountable obstacles.[66] As the Commander of the Atlantic Fleet has stated: "Commanding Officers have sufficient authority to deal with persons having difficulty adjusting to mixed crews. Special authority is not required any more than in handling racial problems."[67] And: "Adjustments and thawing of previously held barriers to the presence of women and acceptance by the male ship's company are social facts of life which must be recognized and dealt with."[68]

Defendants' concerns about undermining morale and discipline argue more for prudent planning in the assignment of women to Navy ships than for not beginning the process at all. In the words of the Chief of Naval Operations: "the transition would have to be carefully planned. Any time you have boys-girls it's a little difficult, but the problems, I guess, are no different than what's happening in college dormitories."[69]

Nor would permitting women to join men on duty at sea pose serious problems in terms of providing separate quarters and facilities. As with morale and discipline, this concern also speaks more to careful planning than to not beginning at all since, as defendants themselves concede, Navy vessels are periodically refitted and modernized to take account of changing needs.[70]

In short, none of the practical concerns voiced by defendants regarding the integration of male and female personnel afford a warrant for upholding the total exclusion reflected in section 6015. Whatever problems might arise from integrating shipboard crews are matters that can be dealt with through appropriate training and planning.

IV. *Conclusion*

Once the decision is reached that section 6015's barrier to women's career and service opportunities is too broad to pass muster, a few comments are required to put this decision in perspective. As the Court has viewed it, the crucial question raised by plaintiffs in this case centers on the exercise of discretion. Ordinarily, and for obvious and understandable reasons, the exercise of discretion in the area of military affairs is left to the executive branch of government subject, of course, to legislative oversight. Thus when, 30 years ago, Congress enacted section 6015 to guide the Navy's discretion in qualifying and assigning women to military duty, it was unquestionably acting within the scope of its constitutional authority to oversee the development and use of a military force. But merely because this legislative choice fell within the bounds of congressional power did not of necessity make it invulnerable to the requirement of reasonableness imposed by the fifth amendment. As the record in this case makes amply clear over a generation later, when Congress carved out the disputed exception to the Navy's ability to use women aboard Navy vessels, it acted without serious deliberation, against the expressed judgment of the military and, by foreclosing the Navy's discretion regarding women well beyond the legitimate demands of military preparedness and efficiency, it acted arbitrarily.

Because the Court has concluded that the blanket limitation imposed by section 6015 cannot presently be justified, the effect of today's decision is to restore to the military an area of discretion that the 80th Congress

---

66. Defs. Ans. to Pl. Sec. Int. Nos. 37–39 & Attach. 7.

67. *Id.*, Attach. 7, Third Endorsement on *USS Sanctuary*, at 6.

68. *Id.*, Attach. 7, Second Endorsement, at 4.

69. *Id.*, Attach. 15, Quoted Statement of Admiral James L. Holloway 3d.

70. *Id.*, Nos. 60–61 & Attach. 1.

unreasonably withheld. This, of course, may well be a temporary adjustment. Defendants have made the Court quite aware of the fact that a considerably narrower limitation on the use of Navy women is currently being considered by Congress. But until the Congress does exercise its discretion in this area, it is incumbent upon the executive to fashion policy regarding women without regard to the absolute and overbroad presumption reflected in section 6015. That much is required by the equality principle embodied in the fifth amendment.

However, nothing in this decision is meant to shape the contours of Navy policy concerning the utilization of female personnel. As the Court has noted in deciding the merits of plaintiffs' claims, there remain many unanswered questions about the effects of full sexual integration that may well convince military authorities that women members should be excluded from shipboard combat assignments, or even from permanent assignment to some non-combat positions, or for that matter, from all shipboard duties until such time as the vessels are properly equipped and crew members properly trained to accommodate their female counterparts. Those are essentially military decisions that are entrusted to executive authorities and the Court expresses no view whatever on what their outcome should be. But what the Court is requiring is that executive authorities move forward in measured steps to approach these issues free from the absolute bar erected by section 6015.

## V. *Disposition*

For the foregoing reasons, the Court concludes that plaintiffs' motion for summary judgment must be granted, and defendants' crossmotion denied. An appropriate order will issue of even date herewith.